## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ALBANY DIVISION

UNITED STATES OF AMERICA,    :
                                :

v.                                  :     Case No.: 1:17-cr-00004 (WLS)
                                :

TREVOR WILLIAMS and       :
SHAUNTANE WILLIAMS,      :
                                :

     Defendants.          :
_____:

## ORDER

Presently before the Court is the Defendants Shauntane and Trevor Williams' Joint Motion to Suppress. (Doc. 45.) For the following reasons, the Defendants' Motion to Suppress is **GRANTED**.

## PROCEDURAL BACKGROUND

On January 10, 2017, Defendants Shauntane and Trevor Williams were indicted on twenty-four counts as follows: one count of conspiracy to defraud the Government with respect to claims, one count of fraud in connection with access devices, ten counts of wire fraud, ten counts of theft of Government money, property, or records, one count of aggravated identity theft – predicate wire fraud, and one count of identity theft – theft of Government property. (Doc. 1.) On May 17, 2017, the Defendants filed the instant joint motion to suppress, arguing that the stop and search of their vehicle violated the Fourth Amendment and that any evidence obtained as a result of that unconstitutional search should be suppressed. (Doc. 45.) The Government timely filed a Response, and the Defendants timely filed a Reply to this Motion. (Docs. 46 & 47.) The Court held a hearing to address the arguments and factual matters underlying this Motion on August 9, 2017 and September 27, 2017. (*See* Docs. 49 & 61.) The Parties timely submitted supplemental briefs following the hearing. (Docs. 64, 65, & 67.)

## FACTUAL FINDINGS

During the Court's hearing on Defendant's Motion to Suppress, the Government presented one exhibit, which was admitted, and one witness. Defendant presented six exhibits, which were not admitted, and examined the same witness. After reviewing the exhibit, the witness's testimony, the Parties' arguments, and the record, the Court makes the following findings of fact.

On February 3, 2014, Defendant Trevor Williams ("Trevor") was driving a black Chrysler, accompanied by his wife Defendant Shauntane Williams ("Shauntane") who was in the passenger's seat and the couples' nine-year-old daughter who was in the back seat of the car. Shortly before 7:00 p.m., Deputy Eric Strom of the Lee County Sheriff's Office observed the vehicle pass his location on GA Highway 520 in Lee County, Leesburg, Georgia. Strom observed that the vehicle was travelling approximately two car lengths behind the vehicle in front of it and moving at a rate of 68 miles per hour, so Strom activated his blue lights at 6:52 p.m. because he believed the vehicle was following too closely for the conditions given that there had been multiple collisions with deer in the area.[1] Upon activating his blue lights, Strom called in a check on the license plate which was from Florida. The car immediately pulled over and stopped.

Strom approached the driver's side and asked Trevor for his driver's license. Trevor's license identified that he was from Tallahassee, Florida. In response to Strom's questions about their trip, Trevor stated that they were going to do some "visiting" in Texas. Trevor also provided a rental agreement for the vehicle, which showed that Shauntane was the renter and that the rental was a one-way rental from Tallahassee, Florida to Grand Prairie, Texas. Back in his patrol car, Strom confirmed that the license was valid through Florida and that the car was a valid rental. But Strom was suspicious of why the car was travelling on Highway 520 because he believed that Interstate 10 was a more direct route from Florida to Texas. After waiting for his back-up officer to arrive, Strom said to the back-up officer, "We got a one-way rental . . . from Tallahassee, Florida to Texas. You see

---

[1] Upon activating his blue lights, Strom's vehicle began recording the scene in front of his vehicle from a few seconds prior, although with some sound distortion. The recording of the traffic stop was admitted at the Motion Hearing and will be cited herein as Doc. 50.

the number one problem here, right? Why aren't we on I-10?" (Doc. 50 at 6:55 p.m.) The back-up officer responded, "Right."

Strom decided to issue Trevor a written warning for following too closely, which he stated to Trevor, and then asked Trevor to step out and walk to the rear of his vehicle. As Strom wrote the warning, he asked Trevor additional questions about their trip. In response, Trevor stated that they would be in Texas until Monday because they were going to look at a car for potential purchase. When Strom asked Trevor if this was the quickest way to Texas, Trevor responded that he and his wife were originally from Albany, Georgia[2] and that they had stopped in Albany at Shauntane's mother's house. Trevor explained that his phone kept losing service with AT&T and that he had to buy a GPS, which brought him that way. When Strom asked what type of car they were going to look at, Trevor stated that it was a 2009 Cadillac SRX. When asked how many miles, Trevor stated "like 96,000 miles." Then, realizing that he had not checked Shauntane's license for warrants, Strom went to ask Shauntane for her license.

While there, Strom asked Shauntane about their trip, to which Shauntane responded that they were going to visit. When asked who they were going to visit, she stated her cousin. In response to further questions from Strom, Shauntane responded that they would be in Texas until Monday and that they were from Albany and had stopped in Albany. Strom asked Shauntane if they were going to rent a vehicle, to which Shauntane said yes. Strom was then more suspicious that the couple's story was rehearsed. Strom then asked whether they were actually going to look at a vehicle, and Shauntane responded, "That too, yes." When asked about the type of car they would purchase, Shauntane responded that it was a 2009 Cadillac SRX. When asked if it had a lot of miles, she stated, "Um, I don't know. It's -," and then Strom immediately asked another question. Strom found it "extremely odd" that Trevor knew the mileage but Shauntane did not. (Doc. 45-3 at 2.) When Strom asked for her license, Shauntane said that it was in the trunk. With Shauntane's permission, Strom then pressed the button to open the trunk and asked Trevor to retrieve Shauntane's license. Strom observed one piece of luggage, jackets, a pair of shoes, and a cooler in the trunk. Strom was very suspicious that a family of three was travelling with only one piece of

---

[2] The Court notes that Leesburg, Georgia shares its southern border with Albany, Georgia.

luggage for a four-day trip. Shauntane then produced her license from her location in the passenger's seat. When asked about having only one piece of luggage, Shauntane responded that she did not need much. Strom then confirmed that Shauntane's license was valid and that she had no warrants, but he was very suspicious about the couple's story and the purpose of their trip. In his car, Strom called someone from the Albany-Dougherty Drug Unit to ask if "Trevor Williams "ring[s] a bell," saying that "something ain't right about this." Strom also seemed to ask the Drug Unit to look into its local records for Trevor Williams.

Strom then spoke to Trevor about them not having much luggage. Trevor responded that they were only going up for the weekend, that it was a thirteen-hour drive, and that they were coming back if they liked the car. Strom thought this conflicted with Shauntane's story that they were going to visit her cousin. Strom then asked Trevor if they were travelling with anything illegal, which Trevor denied. Strom then asked about his criminal background, and Trevor responded that he had been arrested for fighting in the past. As Strom filled out the written warning, he asked Trevor if they had any of several types of drugs, which Trevor denied. Strom told Trevor that they see so many people smuggling drugs to Texas on I-10. Strom then asked whether Trevor had any large sums of money. Trevor then began discussing how his wife runs a tax preparation business and has clients in Albany who she came to see. When re-asked about large sums of money, Trevor responded that there was probably about $2,000 in the car from his wife's business but that he did not know how much money she had. As Trevor continued to talk, Strom told Trevor that he was receiving a lot of nervous and deceptive behavior. Strom then asked Trevor for permission to search the car. After some discussion, Trevor eventually said, "You can search it." Strom then asked Trevor what stuff was his and what was his wife's, because he could not search his wife's stuff without her permission. Trevor responded, "That's her stuff." When asked about his clothes, Trevor stated that his stuff was "in her bag."

Strom then asked Shauntane to step to the rear of the car and asked her for consent to search her property. Shauntane responded, "Naw, I mean I got some personal stuff in there." Trevor then told his wife that she could get her papers out, but Strom told them they could not do that because he was about to deploy his dog. Strom then asked if they

wanted to get their daughter out of the car, but as Shauntane asked more questions, Strom interrupted and went to get his dog, K-9 Billy.

Strom contends that the dog alerted to drugs in the car, but he testified that the dog did not go into its final response. Strom then explained to the Defendants that the dog indicated to drugs in the car, and that he was going to search the car. At the side of Highway 520, Strom searched the passenger compartments and trunk of the vehicle and seized various types of evidence that the Defendants seek to suppress. As Strom searched the vehicle, Shauntane told Strom that she had documents that contained her clients' personal information and that she had cashed her clients' checks and was in town to give her clients their cash. The stop and search lasted more than one hour and eleven minutes. Afterwards, the Defendants agreed to Strom's request that they follow him to the police station, but in route, the Defendants decided not to go to the police station and informed the back-up officer that they would catch up with the officers another time.

## **DISCUSSION**

The Defendants seek to suppress and exclude: the incident report in this case and any statements, forms, or information made or signed by the Defendants on or after February 3, 2014 pertaining to this case, U.S. currency in the amount of $26,413.07 which was seized from the Defendants on or about February 3, 2014, "[a]ny and all other property, papers, information, witnesses, or testimony pertaining to the Defendants obtained as the fruit of the illegal search [and] seizure" on or after February 3, 2014, and "[a]ny and all evidence obtained in any investigation which occurred subsequent to this traffic stop as it is fruit of the poisonous tree." (Doc. 45 at 1-2.) As the movants, each Defendant "bears the burdens of proof and persuasion" that their Fourth Amendment Rights have been violated. *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998). "Rights secured by the Fourth Amendment are personal and cannot be vicariously asserted." *United States v. McKennon*, 814 F.2d 1539, 1545 (11th Cir. 1987). The "touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). "Reasonableness is measured by examining the totality of the circumstances. Rigid time limitations and bright-line rules are generally inappropriate." *United States v. Purcell*, 236 F.3d 1274, 1279 (11th Cir. 2001).

## I.  The Defendants' Standing to Contest the Search and Seizure

A person may only challenge a search or seizure under the Fourth Amendment if he has "standing" to contest the search or seizure, meaning that he has a legitimate expectation of privacy in the area searched that society would recognize as reasonable. *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967)); *Cooper*, 133 F.3d at 1398.  The Government argues that Defendants have not established that their rights were violated by the search, that Shauntane has standing to challenge the search and seizure of the business records, or that the Defendants have a legitimate expectation of privacy in tax documents that do not belong to the Williamses and that are subject to Government inspection by the IRS.  (Doc. 46 at 6-8.)

A court must consider the totality of the circumstances in determining whether a person has standing to challenge a search or seizure. *McKennon*, 814 F.2d at 1543 ("Whether an individual possesses a constitutionally protected privacy interest depends upon the totality of circumstances.") (citations omitted).  The Eleventh Circuit recognizes that people who have received permission from the owner to borrow a car generally have standing to challenge a search of that car. *United States v. Miller*, 821 F.2d 546, 548-549 (11th Cir. 1987) (citing cases).  Likewise, a person who rents a car has received permission from the owner to use the car and usually is found to have a legitimate expectation of privacy in that car. *Cooper*, 133 F.3d at 1402 (finding that defendant had standing to contest the search of a car he rented, even though the rental contract had expired); *cf. United States v. McCray*, 2017 U.S. Dist. LEXIS 116033, at *33 (N.D. Ga. June 15, 2017) (finding that defendant did not have an objective expectation of privacy because he "was not a driver authorized by Hertz to operate its vehicle" and had no dealings with the rental company).  In these cases, the courts have found it key that the movant had possession and control over the vehicle such that he could exclude others. *See United States v. Gibson*, 708 F.3d 1256, 1277-78 (11th Cir. 2013) (finding standing when the vehicle was in the defendant's possession but not when it was driven by another person because "he was not the legal owner of the [car], he has not established that he had exclusive custody and control of the [car], and he was neither a driver of, nor a passenger in, the [car] when it was searched.")  Thus, in considering the factors here, the Court finds that Shauntane has standing to challenge the search of the car because

she was authorized by its owner Enterprise to drive the car per their rental contract. Although the Government argues that Trevor lacks standing because he was an unauthorized driver, the rental contract clearly lists Trevor Williams as an additional authorized driver. (Doc. 45-3 at 20.)[3] Therefore, this Court finds that Trevor's expectation of privacy in the rental car was also subjectively and objectively reasonable, and he too has standing to challenge a search of the rental car.[4]

The next issue is whether the Defendants had "a legitimate expectation of privacy in the object of the search." *U.S. v. McBean*, 861 F.2d 1570, 1573 (11th Cir. 1988) (citing *United States v. Hawkins*, 681 F.2d 1343, 1344 (11th Cir.) (cert. denied) ("[T]he proper analysis proceeds directly to the substance of a defendant's Fourth Amendment claim to determine whether the defendant had a reasonable and legitimate expectation of privacy in the article at the time of the search."). This expectation must be manifested subjectively, and disavowance of the object may indicate a lack of a subjective expectation of privacy in it. *McBean*, 861 F.2d at 1574 (holding that where defendant "stated without reservation and unequivocally that the luggage was not his, and that he did not know what the luggage contained[,] [n]ot only did he fail to manifest a subjective expectation of privacy in the luggage and its contents, he affirmatively disavowed any such expectation."). But, not "every type of statement disclaiming ownership of an article forecloses the establishment of a reasonable expectation of privacy therein." *Hawkins*, 681 F.2d at 1346 (comparing "an affirmative disavowal of ownership" with "a passive failure to claim incriminating

<hr>

[3] Although the incident report and rental contract were not put into evidence at the motions hearing and may constitute hearsay, they are a part of the record that the Court may consider in deciding Defendants' motion. *U.S. v. Raddatz*, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."); *United States v. Dorvilus*, No. 2:13-cr-60-FtM-29UAM, 2013 U.S. Dist. LEXIS 156355, at *29-30 (M.D. Fla. Sep. 5, 2013) ("[T]he Court may nevertheless rely on [hearsay] in considering Defendant's Motion to Suppress"). Moreover, the Court believes that the proper course is to apply a totality of the circumstances test in determining standing in accordance with prior Supreme Court and Eleventh Circuit decisions. *See United States v. Murray*, No. CR410-266, 2011 U.S. Dist. LEXIS 50390, 2011 WL 1806971, at *3-8 (S.D. Ga. May 11, 2011) (rejecting rigid rules and considering the totality of the circumstances in finding that the defendant had a reasonable expectation of privacy in the rental car even though it was rented by his friend) (citing Supreme Court and Eleventh Circuit cases).

[4] Although "[o]ne has a lesser expectation of privacy in a motor vehicle," a person still has privacy interests in his vehicle, especially where its contents are not in plain view. *South Dakota v. Opperman*, 428 U.S. 364, 368 (1976) (explaining that a car is subject to lesser privacy because "[i]t travels public thoroughfares where both its occupants and its contents are in plain view.") (citation omitted). The Court notes that the evidence seized in this case was not in plain view but was located inside of boxes or the Defendants' luggage.

evidence."). The Government argues that Defendants abandoned their privacy interests, but the Government has the burden of proving abandonment by clear evidence. (Doc. 46 at 8); *United States v. Ramos*, 12 F.3d 1019, 1023 (11th Cir. 1994). Here, when Trevor was asked whether he had any large sums of money, he stated that there was about $2,000 in the car and indicated that the money was from his wife's business. Unlike in cases where the defendant was found to lack a legitimate expectation of privacy, Trevor did not affirmatively disavow any knowledge of money but spoke about the source, location, and to some extent the quantity of the money. *Cf. Hawkins,* 681 F.2d at 1344-46 (finding no privacy interest where defendant "had become disruptive to the point of disorderly conduct and yelled that it was not his suitcase" and "continued to disclaim any knowledge of the woman or the suitcase"); *United States v. Edenilson-Reyes*, No. 1:09-CR-00361-RWS-AJB, 2010 U.S. Dist. LEXIS 140187, at *54 (N.D. Ga. Oct. 25, 2010) (no privacy interest where defendant denied ownership of a suitcase and its contents and signed a form disclaiming the same). Moreover, it remained under his and his wife's physical control. *Cf. United States v. McKennon*, 814 F.2d 1539, 1545 (11th Cir. 1987) (finding no legitimate expectation of privacy where defendant "relinquish[ed] possession and control of the carry-on bag" and thereby "effectively surrendered the capacity to exclude others from the bag.") Likewise, when asked about the other items in the car, Trevor stated that his items were in his wife's luggage. By stating such, Trevor contended that he did have personal belongings in the car, which remained under his possession, and that they were commingled with his wife's property. Thus, Trevor's expectation of privacy in the money and the luggage was reasonable.[5]

Shauntane specifically declined Strom's request to search and said that she had personal items in the car.[6] Although the Government argues that the business documents

---

[5] For the same reasons, the Court finds that the Defendants did not affirmatively disavow their privacy interests in the items seized or abandon the items simply because they stated that they would catch up with the police later rather than immediately following Strom to the police station after the search. *See Hawkins*, 681 F.2d at 1346 (finding that a "passive failure to claim incriminating evidence" is not abandonment) (citing *Walter v. United States*, 447 U.S. 649, 658 n.11 (1980) ("Nor can petitioners' failure to make a more prompt claim to the Government for return of the [items] be fairly regarded as an abandonment of their interest in preserving the privacy of the [items]. . . . .We cannot equate an unwillingness to invite a criminal prosecution with a voluntary abandonment of any interest in the [items] . . . .")).

[6] Even if Shauntane's statements were vague, as the Government argues, "as a matter of law, it cannot be said that failure to object to a search equals consent to the search." *United States v. Gonzalez*, 71 F.3d 819, 829-30 (11th Cir. 1996).

did not personally belong to her and that she failed to establish the business's corporate structure, case law indicates that under the circumstances, Shauntane had a legitimate expectation of privacy in the business's documents. Shauntane insisted that as part of her tax preparation business, she traveled to her clients' homes to prepare their tax forms. The documents were not in a public space shared with other employees, but were being kept in her rental car under her (and possibly her husband's) exclusive control along with their other personal documents and belongings. That is sufficient to find a reasonable expectation of privacy in those documents. *See United States v. Chaves*, 169 F.3d 687, 690-91 (11th Cir. 1999) (finding standing where defendant possessed the only key to the searched warehouse, "giving him a measure of control and ability to exclude others[,]" and kept personal and business records in the warehouse); *Henzel v. United States*, 296 F.2d 650, 653 (5th Cir. 1961) (finding that the sole stockholder and president of a corporation had standing to challenge the seizure of corporate books and records when he had prepared much of the confiscated material, which was kept in his office along with his personal belongings). Thus, the facts show that Shauntane had a subjective and objective expectation of privacy in her business's seized records.[7]

As to the tax returns[8] specifically, case law indicates that "[a]n expectation of privacy in documents is not reasonable where a government agency has the right to inspect the records." *United States v. Evaschuck*, 65 F. Supp. 2d 1360, 1365 (M.D. Fla. 1999) (citing *United States v. Welliver*, 976 F.2d 1148 (8th Cir. 1992)). In *Evaschuck*, the court considered whether the defendant had a legitimate expectation of privacy in airplane maintenance records and found that because the statute required retention for potential inspection only for one year, and the records were more than one year old, the defendant's expectation of privacy was reasonable and he had standing. 65 F. Supp. 2d at 1365. In *Welliver*, however, the Eighth Circuit found that the defendant's expectation of privacy was not reasonable because he was

---

[7] Thus, even if Trevor's subsequent consent could be deemed valid, and the Court finds hereinafter that it was not valid, his consent would not be sufficient to justify a search because Shauntane was the actual renter of the car, was present, and had privacy interests in the car and its contents.

[8] The Court assumes the Government is referring to the tax returns when it references "tax documents." (Doc. 46 at 8.) If the Government is referring to any documents that could be used for tax purposes, the Court finds that such documents would be subject to even more of a privacy interest than the tax returns because there is no indication that such documents would have to be disclosed to the Government.

required to make available "access to any record or operation of the Company" for three years and "keep records that fully disclose all matters pertaining to th[e] Agreement," and that the records seized fell into such categories. 976 F.2d at 1153. Here, the Government argues that pursuant to 26 U.S.C. § 6107, a tax preparer must for three years after the close of the return period: "(1) retain a completed copy of such return or claim, or retain, on a list, the name and taxpayer identification number of the taxpayer for whom such return or claim was prepared, and (2) make such copy or list available for inspection upon request by the Secretary [of the Treasury Department or his delegate]."[9] On its face, this statute describes the specific records that must be kept and made available, and it does not require that the tax returns themselves be made available for inspection. Moreover, there is no indication that this statute provides any authority for a deputy acting under authority of a local sheriff's office to inspect or seize a person's federal tax returns without some prior authorization or observation of explicit illegality. The Court recognizes that by Shauntane's own statements that she is a tax preparer and has cashed her clients' tax refund checks, the tax returns either will be, or most likely have already been, disclosed to the federal government. Nonetheless, the Court is not convinced that simply because documents have been disclosed to the federal government in the past, a person can no longer have a legitimate expectation of privacy in them for any other purpose, especially as to a local sheriff's office at a routine traffic stop. Rather, most members of society would expect tax returns under their possession to remain private, and, under the law, a tax preparer need only provide a list of the relevant tax information for the IRS's inspection. Thus, Shauntane's expectation that the tax returns be kept private is reasonable under the circumstances. Without any other arguments advanced on this issue by the Parties, the Court concludes that Shauntane has standing to contest the search and seizure of all of her business records, including the tax forms.

Accordingly, Shauntane and Trevor have standing to challenge the search of the car and all evidence uncovered therefrom.

---

[9] *See* 26 U.S.C.S. § 7701(a)(11)-(12).

## II.    Whether the Initial Stop of Defendants' Car was Pretextual

When police stop a motor vehicle, a Fourth Amendment "seizure" occurs, but "the decision to stop an automobile is [generally] reasonable where the police have probable cause to believe that a traffic violation has occurred." *United States v. Whitlock*, 493 F. App'x 27, 30 (11th Cir. 2012) (quoting *Whren v. United States*, 517 U.S. 806, 810 (1996)); *United States v. Spoerke*, 568 F.3d 1236, 1248 (11th Cir. 2009) ("A traffic stop… 'is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with Terry [v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)].' " (citation omitted). The key inquiry is "whether a reasonable officer *would* have made the seizure in the absence of illegitimate motivation." *United States v. Smith*, 799 F.2d 704, 708-09 (11th Cir. 1986) (clarifying that the question is "not whether the officer *could* validly have made the stop but whether under the same circumstances a reasonable officer *would* have made the stop in the absence of the invalid purpose."). Thus, to determine whether Strom's stop of the Defendants' car was pretextual, this Court must determine whether the stop was "objectively reasonable" such that a reasonable officer in the same circumstances would have stopped the Defendants. *Id.* at 709.

Pursuant to O.C.G.A. § 40-6-49(a), a driver "shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." Courts have found stops lawful when the circumstances objectively indicated that the driver was violating this or similar statutes. *See United States v. Brounson*, No. 1:15-CR-00366-ELR-JFK, 2016 U.S. Dist. LEXIS 112352, at *22 (N.D. Ga. May 23, 2016) (finding reasonable suspicion to stop where officer observed defendant driving less than one car length behind truck which posed a danger in the heavy traffic); *Whitlock*, 493 F. App'x at 30 (finding no error in conclusion that traffic stop for following too closely and illegal window tint was reasonable). But, courts have found stops unlawful based on pretext where the officer either lacked probable cause to stop the car or decided to stop the car before a traffic violation had occurred. *See, e.g., Smith*, 799 F.2d at 709 (finding stop unlawful where officer testified that "the car was being driven with an abundance of caution," and the Court found that the officer's actual reason for stopping the car was based on a drug courier profile); *Miller*, 821 F.2d at 549 (finding stop pretextual

where "[t]he trooper decided to pursue and stop Miller's car before any alleged traffic violation occurred" because he hoped to catch a drug courier). The Court is aware that "[t]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent." *Whren*, 517 U.S. at 814.

Here, Strom asserts that he observed the Defendants' car following too closely when it passed his location on Highway 520. Although later in the stop Strom does appear determined to uncover what he ultimately suspected was drug-related activity, at the time he decided to stop the Defendants' car, there is no indication that he was acting upon an illegitimate motivation. Further, because "great deference is given to the judgment of a trained law enforcement officer on the scene," the Court will defer to Strom's opinion of what he saw before the video recording began. *Whitlock*, 493 F. App'x at 29 (internal quotation marks and citation omitted). "For the run-of-the-mine case, which this surely is, we think there is no realistic alternative to the traditional common-law rule that probable cause justifies a search and seizure." *Whren*, 517 U.S. at 819. Without sufficient evidence to the contrary, the Court accepts as true Strom's assertion that he observed the car following too closely when it passed him and finds that Strom had probable cause to stop the Defendants' car for a traffic violation.[10] Thus, the Court finds that the initial stop of Defendants' car was legitimate and not based on pretext.

## III. Whether the Traffic Stop was Impermissibly Prolonged

For a stop to remain lawful, it must be "reasonably related in scope to the circumstances which justified the interference in the first place" and "may not last any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity." *United States v. Boyce*, 351 F.3d 1102, 1106 (11th Cir. 2003) (internal quotation marks and citations omitted). An officer may only prolong a traffic stop "in special circumstances," which are: (1) "to investigate the driver's license and the vehicle registration," including by computer check, (2) in the interest of officer safety, to await the results of a criminal history check that is part of the routine traffic investigation, and (3) if he

---

[10] There is no evidence that Strom knew that the car had a Florida tag or knew the race of the occupants prior to his decision to stop the car. *See* Doc. 60 at 17:4-13. Because Defendants have failed to establish that Strom had an improper motive when he made the decision to stop the car, the Court cannot find that pretext existed at the time of the stop.

has "articulable suspicion of other illegal activity." *Id.* (quoting *United States v. Purcell*, 236 F.3d 1274, 1277-78 (11th Cir. 2001)).

Courts assess the duration of a stop prior to the officer obtaining consent or probable cause to search because an unreasonably long stop could become an unlawful detention, making a subsequent search invalid. *Purcell*, 236 F.3d at 1279. In assessing such stops, the Eleventh Circuit has found that fourteen and even fifty minutes may be reasonable in length. *Id.* ("Fourteen minutes is not an unreasonable amount of time for a traffic stop. We have approved traffic stops of much longer duration.") (citing *United States v. Hardy*, 855 F.2d 753, 761 (11th Cir. 1988)). Here, approximately eighteen minutes elapsed before Trevor allegedly consented to a search of the car and approximately twenty-three minutes before Strom completed the dog sniff of the car. Considering the case law, the Court does not find these amounts of time in and of themselves to be so long as to constitute an unreasonable detention.

The Court must next consider the totality of the circumstances to determine if the stop was impermissibly prolonged. Here, a mere two minutes after asking for Trevor's license, Strom called his partner from his patrol car and stated, "We got a one-way rental . . . from Tallahassee, Florida to Texas. You see the number one problem here, right? Why aren't we on I-10?" (Doc. 50 at 6:55 p.m.) At this point, Trevor's license and the car's license plate had been checked, and the only potentially suspicious factors were those just mentioned on Strom's call. Strom testified that he was suspicious about a car traveling from Florida to Texas on Highway 520 because I-10 is a direct route, and presumably, travelers would only go out of their way to drive on Highway 520 if they were trying to avoid being caught. *See* Doc. 60 at 20:2-8, 28:7-9. But these factors alone are insufficient to justify prolonging a stop. *See United States v. Boyce*, 351 F.3d 1102, 1109 (11th Cir. 2003) ("[A] plan to return the car late, combined with . . . driving a rental car on a widely used interstate that also happens to be a known drug corridor[] does not create a reasonable suspicion.").

After reviewing the rental paperwork, Strom said that he was going to issue Trevor a warning for following too closely, but instead, Strom continued questioning each of the Defendants for several more minutes. As he was writing the warning, Strom asked Trevor a multitude of questions and even stopped writing to listen to Trevor's answers, further

delaying the time it should have taken to finish the warning. Strom's questions inquired about the length of their trip and why it was so short, Trevor's job and the specific type of business he was in, the odd nature of their one-way rental to Texas, whether their route was the quickest way to travel to Texas, the type of car they were going to look at, its year and its mileage. Trevor's answer to each question was reasonable and logical. As to Strom's only bases for suspecting criminal activity – that the couple was driving a rental car one-way from Florida to Texas via Highway 520 – Trevor's answers should have dispelled Strom's suspicion. Trevor informed Strom that they lived in Florida, were originally from Albany and had stopped in Albany but due to loss of phone service, had to purchase a GPS which directed their route. *Boyce*, 351 F.3d at 1109 (finding that a reasonable answer should dissipate suspicion and that "even if [defendant] had not explained himself, his travel plans, though unusual in [the officer's] opinion, do not suggest any criminal activity."). Even if Strom had suspected that the response about buying a car was false, any likelihood of falsity was reduced because Trevor knew the make and model of the car they were going to buy, that the car was a small SUV, and could even estimate the car's mileage. But Strom was still suspicious, and even asserted that he believed the story could be rehearsed. (Doc. 45-3 at 2.)

Strom then went to ask Trevor's wife, the co-Defendant, very similar questions to those he had asked Trevor, presumably to compare their stories. Shauntane's answers were largely consistent with Trevor's. Strom states that the "slight inconsistencies" made him suspicious, but the Court finds that Shauntane's answers were not objectively suspicious. She too stated that they were going to visit in Texas, but when probed about a car, affirmed that they were going to get a car also. Even though she initially responded "yes" to Strom's question if they were going to rent a car, such a response does not indicate that she was lying or unable to "recall" the details of a rehearsed story as Strom implied. Doc. 45-3 at 2; *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003) (finding that a traffic stop is an "unsettling show of authority that may create substantial anxiety," and that even though the defendants each named a different girl they were going to see, there was no contradiction because they could logically see two different people). Not only is it plausible that the unsettling nature of the stop caused Shauntane to misspeak, but it is also likely that they would have to rent another car if they did not like the car they were going to look at for

potential purchase.  Furthermore, Shauntane too provided the make, model, and year of the car they were going to potentially buy, such that "suspicious inconsistencies virtually evaporated and any justification . . . for further investigation based on this inconsistency dissipated." *Boyce*, 351 F.3d at 1109 (citation omitted).  When asked whether the car has "got a lot of miles," she stated that she did not know and then began to speak further about the car, but was interrupted by another question from Strom.[11]  Not only would it be entirely reasonable if Shauntane did not know whether the potential car had "a lot of miles," a vague phrase, but it undercuts Strom's theory that the story was rehearsed, rather than raises a suspicion based on an inconsistency.[12]  If a person does not know a specific fact about something only tangentially related to their trip, that does not provide a reasonable basis for suspecting criminal activity.  *See Boyce*, 351 F.3d at 1109 ("[C]onflicting answers about where one is traveling to or from may give rise to a suspicion of drug activity because most drivers know the answers to these questions," but certain reasonable responses "do[] not suggest any criminal activity.")

Shauntane then informed Strom that her license was in the trunk, and after asking Trevor to retrieve the license from the trunk, Strom observed that the trunk only contained one piece of luggage and other small items.[13]  Strom then asked Shauntane about the luggage, and she stated that she did not need much.  But, after seeing the single piece of luggage and Shauntane producing her license from the passenger's seat, Strom was "very suspicious about the purpose of the trip and the story provided by Trevor and Shauntane." (Doc. 45-3.)  While checking Shauntane for warrants, Strom called the Albany-Dougherty Drug Unit to ask if they were familiar with Trevor: "Does Trevor Williams ring a bell? Black guy, supposed to be from Albany, lives in Tallahassee now.  . . . I was going to get you to

---

[11] The Court notes that Shauntane may have known the mileage on the car, but Strom did not give her an opportunity to finish her answer.

[12] The Court questions Strom's credibility because he was suspicious that the Defendants' stories were both rehearsed and inconsistent and found factors "extremely odd" that were, in fact, hardly odd at all.  (Doc. 45-3 2.)  Unlike what Strom wrote in his incident report, the video recording indicates that Shauntane remained normal and calm, and even continued answering his questions about the car they were going to buy.  Strom also failed to mention in his report that he called the Albany-Dougherty Drug Unit to inquire about Trevor after he had already checked Shauntane's license, or that the drug unit ultimately responded that Trevor only had a charge that was "very minute . . . not anything serious."  *See id.* at 3; Doc. 60 at 38:6-39:4.

[13] Neither party raised the issue of whether Shauntane consented to a search of the trunk by stating that her license was in the trunk and that she wanted her husband to retrieve it, and therefore, the Court will not address that issue.

look into locals for me. Um, something ain't right about this." (Doc. 50 at 7:04 p.m.) On the call, Strom then listed the factors that made him suspicious, which included that it was a one-way rental from Tallahassee to Texas, Trevor said he was going to buy a car, and they only had one piece of luggage for their trip through Monday. The first two factors did not create reasonable suspicion of criminal activity as explained above.[14] As to the issue of the luggage, having a small amount of luggage does not necessarily indicate criminal activity. In the case of this family travelling to Texas, it was entirely reasonable that they only needed a small amount of clothing for a trip lasting from Friday night to Monday, where two days would be spent riding in the car.[15] *See Reid v. Georgia*, 448 U.S. 438, 441 (1980) (finding that arriving early in the morning from Fort Lauderdale, Florida, a place of origin of cocaine, with no luggage other than shoulder bags was not sufficient for reasonable suspicion because those factors "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in [that] case could justify a seizure") (overruled on other grounds); *United States v. Tapia*, 912 F.2d 1367, 1371 (11th Cir. 1990) (finding suspicion not reasonable based on "having few pieces of luggage, being visibly nervous or shaken during a confrontation with a state trooper, or traveling on the interstate with Texas license plates"). The factors Strom cited as "suspicious" could apply to many innocent travelers, and "[where] factors would likely apply to a considerable number of those traveling for perfectly legitimate purposes, [they] do not reasonably provide suspicion of criminal activity." *Boyce*, 351 F.3d at 1109 (citation omitted); *Tapia*, 912 F.2d at 1371 ("[N]either police officers nor courts should sanction as 'reasonably suspicious' a combination of factors that could plausibly describe the behavior of a large portion of the motorists engaged in travel upon our interstate highways."); *Karnes v. Skrutski*, 62 F.3d 485, 493 (3rd Cir. 1995) ("[T]he factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied."). Thus, there was no reasonable suspicion to justify

---

[14] Although it was odd that Shauntane stated that her license was in the trunk when she actually had it with her, that does not suggest criminal activity singularly or in combination with the other factors Strom observed.

[15] Even after hearing Trevor's subsequent response that they had a thirteen-hour drive and were coming back after looking at the car, Strom was still not satisfied. No significant inconsistencies were ever made about their trip, and the Defendants' answers should have reduced Strom's suspicion.

extending the stop.  *See Perkins*, 348 F.3d at 969 (finding no reasonable suspicion justifying continued detention based on defendant's nervousness, "odd behavior" in repeating the questions asked, possessing a Florida driver's license though claiming to live in Alabama, and "inconsistent statements" about who defendants were going to visit in Alabama).

Considering all of the circumstances of the traffic stop, the Court finds that Strom had completed the purpose of the stop when he finished checking Shauntane's license, and therefore, should not have thereafter inquired about whether there was contraband in the car.  By comparison, in *United States v. Shabazz*, the Fifth Circuit held that a traffic stop was not impermissibly extended by questioning occupants four minutes into the stop about their travel plans because the officer was still waiting on the results of a computer check of the driver's license.  993 F.2d 431, 437 (5th Cir. 1993).  Here, once Strom finished checking Shauntane's identification twelve minutes into the stop, he was no longer waiting on any information related to the traffic stop.[16]  Similarly, the Eleventh Circuit found that where an officer learned about a driver's prior drug-related criminal history while writing a citation, "even if his suspicions did not arise to the level of 'articulable,' reasonable safety concerns justified [the deputy] in asking [the defendant] whether he had any firearms, guns or drugs in the car."  *Purcell*, 236 F.3d at 1280 (citing *United States v. McRae*, 81 F.3d 1528, 1536 (10th Cir. 1996*)* for its finding that "vague rental car arrangements plus knowledge of prior criminal involvement permit the officer to ask about contraband and weapons.").  Here, no similar safety concerns arose because Strom had no indication that the Defendants had any criminal history by the time he finished checking Shauntane's license.  Rather, by that time, Strom had concluded the purpose of the stop and had no specific facts to justify asking additional questions of the Defendants or further prolonging the stop.  As he testified at the motion hearing, Strom told Trevor several times during the stop that he was going to issue Trevor a warning (Doc. 60 at 53:18-25); yet, the Court finds that each time, Strom continued investigating his suspicions.  This Court agrees with other circuit courts that "[w]hen the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for

---

[16] The Court finds that Strom's call to the Albany-Dougherty Drug Unit did not justify extending the stop because it was neither related to officer safety nor part of the initial routine traffic investigation.  *Boyce*, 351 F.3d at 1106.  Further, it provided no information justifying further inquiry.

additional questioning" absent justification for the continued questioning. *Shabazz*, 993 F.2d at 435-36 (5th Cir. 1993) (quoting *United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir. 1988)).

Even though Strom continued to write on the warning and finished writing precisely upon asking Trevor if he could search the car, the Court is persuaded that Strom unreasonably extended the stop based on his insufficient and objectively unreasonable suspicions such as to delay the Defendants and the time "necessary to process the traffic violation."[17] *Boyce*, 351 F.3d at 1111. The Court so finds because "[a]uthority for the seizure ends when tasks tied to the traffic infraction are – *or reasonably should have been* – completed." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614-15 (2015) (emphasis added) ("[A] traffic stop becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a warning ticket.") Unlike in other cases where no Fourth Amendment violation was found, here, Strom's questions measurably extended the duration of the initial seizure, and therefore, exceeded the scope of the stop. *Cf. Purcell*, 236 F.3d at 1280 ("Questions which do not extend the duration of the initial seizure do not exceed the scope of an otherwise constitutional traffic stop."); *United States v. Burrows*, No. CR 212-001, 2012 U.S. Dist. LEXIS 146695, at *10 (S.D. Ga. Oct. 11, 2012) ("[B]rief questioning on matters unrelated to the traffic violation, which took only a minute or so, did not unreasonably prolong the stop in violation of the Fourth Amendment."). The Court is further convinced that Strom sought to extend the stop because upon checking Shauntane's license, he asked the local drug unit to check its records for Trevor Williams even though he then had no objectively reasonable suspicion or justification for continuing the stop. *See* Doc. 50 at 7:04 p.m. Like in *Boyce*, "[Strom's] questions about contraband extended the duration of the initial seizure, . . . [Strom] did not have a reasonable suspicion of criminal activity[,] and . . . [Strom] never testified that it was concern for his safety that prompted him to expand the

---

[17] The Government argues that at 7:06 pm Strom was still "obtaining information necessary to complete the written warning, such as the make and model of the rental vehicle," (Doc. 46 at 15), presumably because at that time, Strom was still writing on the warning and asked what type of car Trevor was driving. But the evidence shows that at 6:54 pm, a dispatcher reported that the vehicle was a 2013 Chrysler and at 7:01 pm, Strom returned the rental contract to Shauntane. Strom could clearly see what type of car Trevor was driving throughout the stop. The Court finds that he did not need to prolong the stop to determine the car's make and model.

scope of his questioning." 351 F.3d at 1111. Therefore, this Court finds that "the resulting search was unconstitutional." *Id.* at 1110. Generally, when evidence is "obtained in an encounter that is in violation of the Fourth Amendment, including the direct products of police misconduct and evidence derived from the illegal conduct, or 'fruit of the poisonous tree,' [it] cannot be used in a criminal trial against the victim of the illegal search and seizure." *Perkins*, 348 F.3d at 969.

## IV. Consent and Probable Cause

Although not specifically raised by the Government, the Court further finds that any subsequent consent given by Trevor to search the car was invalid. "In order to eliminate any taint from an involuntary seizure or arrest, there must be proof both that the consent was voluntary and that it was not the product of the illegal detention. Among the relevant factors are the temporal proximity of an illegal arrest and confession, intervening circumstances, and the purpose and flagrancy of the official misconduct." *Miller*, 821 F.2d at 549-50 (quoting *United States v. Berry*, 670 F.2d 583, 604-05 (5th Cir. Unit B 1982) (en banc)). None of the factors which can render tainted consent into voluntary consent existed here. *See, e.g., Berry*, 670 F.2d 583 (finding consent voluntary because the defendants were told they could refuse consent and consult an attorney, were allowed to consult with each other outside of the officers' hearing, and moreover, arguable probable cause existed to detain them); *United States v. Geboyan*, 367 F. App'x 99, 101 (11th Cir. 2010) (finding consent voluntary where officer "gave [the defendant] a traffic citation, her driver's license, and the other documents provided by her passengers" and the defendant "had everything she reasonably required to proceed on her journey."). But where the officer is still holding the defendants' property such that they are not free to go, where there are no intervening circumstances between the unlawful detention and the consent, or where the officer's conduct is not justified, the consent may be found involuntary and the resulting search found unlawful. *See, e.g., Miller*, 821 F.2d at 550 (finding consent involuntary because taint of the unlawful detention was not sufficiently attenuated) (citing *United States v. Thompson*, 712 F.2d 1356, 1362 (11th Cir. 1983) (finding consent involuntary where "there was no significant lapse of time between the unlawful detention and the consent," that "no intervening circumstances dissipated the effect of the unlawful detention," and that the

officer's conduct had "no arguable [legal] basis")); *United States v. Jones*, 234 F.3d 234, 243 (5th Cir. 2000) (consent not voluntary where officers "appeared to knowingly prolong the detention" by failing to return a passenger's ID). Indeed, the government must prove that the consent was voluntary and valid, which is a heavier burden when the consent is preceded by a Fourth Amendment violation. *Shabazz*, 993 F.2d at 438 (citations omitted); *see also United States v. Chavez-Maciel*, No. 1:10-CR-00490-TCB-LTW, 2012 U.S. Dist. LEXIS 183038, at *19 (N.D. Ga. Dec. 7, 2012). Here, as Strom was asking for Trevor's consent to search, he finally handed over both Defendants' licenses, but kept the written warning, and there was otherwise little indication that Trevor knew he was free to go because there were no intervening factors between Strom's unlawful prolonging of the stop and his request for Trevor's consent to search. *See* Doc. 50 at 7:09. In fact, when Trevor was first asked for his consent to search, he did not consent but instead explained that his wife had stopped to serve her clients, and even after consenting, he asked his wife to remove her belongings – which Strom refused. Moreover, because Strom had completed the purpose of the stop and had no lawful reason for continuing to question Trevor, Strom's actions were not justified. The Government has not even argued how Trevor's consent was an act of free will. Thus, the Court finds that Trevor's consent was the product of an unlawfully prolonged stop and was not voluntary and that Strom's search of the car was unlawful.

The same reasoning applies to Strom's deployment of the K-9 to sniff for narcotics. Because Strom's deployment of the K-9 occurred after Strom impermissibly prolonged the traffic stop to question Trevor about contraband, this deployment could only provide probable cause to search if the Government establishes that the dog sniff was not tainted by Strom's unlawful actions. *See United States v. Santa*, 236 F.3d 662, 677 (11th Cir. 2000). The Government has failed to carry this burden because the record shows that the dog was deployed as a result of the information uncovered after Strom unlawfully prolonged the stop and the Government has not shown otherwise.[18] Therefore, the Court concludes that the dog sniff was the product of Strom's unlawful actions and that all of the evidence the Defendants seek to suppress is the fruit of Strom's violation of their Fourth Amendment

---

[18] *Cf. Illinois v. Caballes*, 543 U.S. 405, 408 (2005) (finding a dog sniff lawful during a reasonably executed traffic stop where the dog sniff was not "the consequence of a constitutional violation").

rights. *Santa*, 236 F.3d at 677 (finding consent tainted because Government failed to show that "[i]ntervening events or circumstances independent of the primary illegality may have so attenuated the causal connection as to dissipate the taint of unlawful police action") (citation omitted); *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (citation omitted) (holding that the Government could not use statements which were discovered "by exploitation of [an] illegality" rather than "by means sufficiently distinguishable to be purged of the primary taint") (citation omitted); *cf. United States v. Rendon*, 462 F. App'x 923, 926 (11th Cir. 2012) (finding that a dog sniff was not tainted by a prior unlawful search because the prior search uncovered nothing and there was reasonable suspicion to justify continued detention of the driver). Thus, the Court need not determine whether K-9 Billy established probable cause for Strom to search the Defendants' car. [19]

For the same reasons, the automobile exception does not render Strom's search of the car lawful. As argued by the Government, the automobile exception is an exception to the requirement that officers have a search warrant where probable cause exists to believe that a car contains contraband. (Doc. 46 at 16-17). By the time Strom finished checking Shauntane's license, he did not have reasonable suspicion, let alone probable cause, to believe the Defendants' car contained contraband. To the extent probable cause ever arose, it was after Strom impermissibly prolonged the stop, and thus, the automobile exception does not create a justification for the warrantless search in the circumstances shown here.

## V. The Exclusionary Rule

Where a Fourth Amendment violation has occurred, the United States Supreme Court has made it clear that the suppression or exclusion of evidence is *not* "a personal constitutional right" designed to "'redress the injury' occasioned by an unconstitutional search." *United States v. Smith*, 741 F.3d 1211, 1218 (11th Cir. 2013) (quoting *Davis v. United States*, 564 U.S. 229, 236 (2011)). Its "sole purpose" is "to deter future Fourth Amendment violations." *Id.* at 1218-19 (citing *Davis*, 564 U.S. at 236-37). For this reason, exclusion is "a remedy of 'last resort,' justified *only* where the 'deterrence benefits of suppression' outweigh the 'substantial social costs' of 'ignoring reliable, trustworthy evidence bearing on guilt or

---

[19] The Court notes that even if the search was otherwise not prohibited, an issue would still remain as to whether the dog's conduct established probable cause to search.

innocence.'" *Id.* (quoting *Davis*, 564 U.S. at 237); *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (holding that the exclusionary rule has always been a rule of last resort because of the substantial social costs it generates, including letting the guilty and dangerous go free). Given the exclusionary rule's purpose, "evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional." *United States v. Leon*, 468 U.S. 897, 919 (1984) (citing *United States v. Peltier*, 422 U.S. 531, 542 (1975)) (holding that evidence need not be suppressed where the officers' actions were objectively reasonable). As such, "[p]olice conduct is not wrongful when it is in strict compliance with binding precedent. . . [and when police] conform their conduct to these rules." *Smith*, 741 F.3d at 1219 (quoting *Davis*, 131 S.Ct. at 2423-29) (internal quotations omitted). Because the exclusionary rule "necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct," "[w]here the official action was pursued in complete good faith, [] the deterrence rationale loses much of its force." *Peltier*, 422 U.S. at 539 (citation omitted).

The Government argues that "the Court must assess the state of the law pre-*Rodriguez* in order to determine whether Strom's actions are objectively reasonable." (Doc. 65 at 20) (referencing *Rodriguez*, 135 S. Ct. 1609). Although the Court need not do so, the Court can assess Strom's actions pre-*Rodriguez* because the legal principles violated by Strom's actions were well-established at the time of the search at issue. The Eleventh Circuit, relying on Supreme Court precedent, has long-established that a traffic stop "may not last 'any longer than necessary to process the traffic violation' unless there is articulable suspicion of other illegal activity." *Boyce*, 351 F.3d at 1106 (quoting *Purcell*, 236 F.3d at 1277 (quoting *United States v. Holloman*, 113 F.3d 192, 196 (11th Cir. 1997))). Having begun his career in law enforcement in 2008, Strom not only should have been aware of this requirement but testified to such awareness. (Doc. 60 at 59:1-4) (Strom responding "I continued my investigation based on the articulable reasonable suspicion I had that criminal activity was afoot based on the totality of the circumstances.").

Although Strom insists in his incident report and hearing testimony that he had reasonable suspicion, and even accurately stated the relevant legal standard, the Court has found that it was not objectively reasonable for Strom to suspect criminal activity by the

time he concluded checking Shauntane's license for warrants. At that time, all Strom knew was that a black[20] married couple and their nine-year-old daughter were traveling in a valid rental car from Florida to Texas. He knew that there were no outstanding warrants on the Defendants, that their licenses were valid, and that the local drug unit was unfamiliar with Trevor even though he was from Albany. He knew that they had stopped in Albany and were going to Texas to visit and to look at a car that they were interested in buying. He knew that they were driving to Texas that Friday night and planned to return on Monday and had one piece of luggage in the car. Case law has established and this Court finds that such factors, even taken together, were insufficient to create articulable suspicion of criminal activity and constitute the classic example of an inchoate "hunch." *See Reid*, 448 U.S. at 441 (finding that arriving early in the morning, when law enforcement activity is lower, from a known drug-source state with no luggage other than shoulder bags was not sufficient for reasonable suspicion); *Boyce*, 315 F.3d at 1109 ("A plan to return the car late, combined with the fact that Boyce was driving a rental car on a widely used interstate that also happens to be a known drug corridor, does not create a reasonable suspicion"); *Smith*, 799 F.2d at 706-07 (suspicion unreasonable where car was occupied by two individuals around thirty-years old, had out-of-state tags, and was being driven northbound out of Florida at 3:00 am); *Perkins*, 348 F.3d at 969 (finding no reasonable suspicion based on defendant's nervousness, "odd behavior" in repeating the questions asked, possessing a Florida driver's license though claiming to live in Alabama, and "inconsistent statements" about who defendants were going to visit in Alabama but that these merely created a "hunch"); *Tapia*, 912 F.2d at 1371 ("Being Mexican, having few pieces of luggage, being visibly nervous or shaken during a confrontation with a state trooper, or traveling on the interstate with Texas license plates" do not provide reasonable suspicion).[21] Rather, "the police officer must be able to point to

---

[20] The Court mentions this factor because Strom raised it during the traffic stop. *See* Doc. 50 at 7:04 p.m. ("Does Trevor Williams ring a bell? Black guy, supposed to be from Albany, lives in Tallahassee now."

[21] In fact, the existing case law indicates that much more was required to have reasonable suspicion. *See, e.g.*, *Purcell*, 236 F.3d at 1280 (suspicious factors that may not even have been "articulable" included that defendants were "in a very high crime corridor," that the driver "produced a rental car contract signed by a party not in the car," and the defendant's name as an additional driver "had been scratched out."); *Brounson*, 2016 U.S. Dist. LEXIS 112352, at *29-30 (suspicious factors included that defendants were "extremely nervous, abnormally nervous for a traffic stop and that their hands were shaking, their breathing was labored and, although the air conditioning was on high, sweat beads were on their faces.") (internal quotation marks

specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21-22. The Eleventh Circuit "require[s] more than the innocuous characteristics of nervousness, a habit of repeating questions, and an out-of-state license for giving rise to reasonable suspicion." *Perkins*, 348 F.3d at 971. Moreover, the Court is further concerned about the reasonableness of Strom's asserted suspicions of drug-related activity because, although irrelevant for this review, as of today in this case, there has been no indication that the Defendants were lying about the purpose of their trip to Texas, and no drugs were ever discovered.

All of the circumstances of this traffic stop justify suppression. The factors that Strom alleged created articulable suspicion were consistent with a large number of perfectly innocent travelers; therefore, Strom should have known that his suspicion was not reasonable. *See, e.g., Reid*, 448 U.S. at 441 (factors are insufficient to provide reasonable suspicion where they "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures"); *Smith*, 799 F.2d at 707 (reasonable suspicion should be "the result of 'reasonable inferences' from 'unusual conduct,'" and should not "apply to a considerable number of those traveling for perfectly legitimate purposes") (quoting *Terry*, 392 U.S. at 27); *Boyce*, 351 F.3d at 1109 ("[F]actors [that] would likely apply to a considerable number of those traveling for perfectly legitimate purposes, do not reasonably provide suspicion of criminal activity.") (citation omitted); *Karnes*, 62 F.3d at 493 (3rd Cir. 1995) ("The factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied.").[22] Had Strom's actions been justified for officer safety, that would lean against suppression, but Strom has made no such contention, and the Court finds that, in any event, his actions in prolonging the stop were not justified for safety reasons. *Cf. United States v. Clark*, 337 F.3d 1282, 1286 (11th Cir. 2003) ("[T]he interest in officer safety outweighs the liberty interest of a passenger

---

omitted); *United States v. Simms*, 385 F.3d 1347, 1354 (11th Cir. 2004) (police had reasonable suspicion and possibly probable cause where car matched a BOLO alert, driver was "extremely nervous, with hands shaking," and had a large cut on his neck that had been treated in Texas though he was from Florida).

[22] As in *Miller*, "[t]he record does not reveal how many unsuccessful searches [Deputy Strom] has conducted or how many innocent travelers the officer has detained. Common sense suggests that those numbers may be significant. As well as protecting alleged criminals who are wrongfully stopped or searched, the Fourth Amendment of the Constitution protects these innocent citizens as well." 821 F.2d at 550.

who is not suspected of violating the law."). Moreover, his unjustified extension of the stop was a but-for-cause of the discovery of evidence in this case. *Hudson v. Michigan*, 547 U.S. at 592 ("[B]ut-for causality is [] a necessary . . . condition for suppression."). Furthermore, even though Strom was still writing the warning at the time he asked Trevor about drugs and large sums of money, almost every delay in the traffic stop was created by Strom's actions. Moreover, because Strom had just asked the local drug unit to check its records for Trevor Williams' name, the Court is further convinced that Strom was motivated to prolong the stop to await the results of that check. Under such circumstances, it defeats the purpose of the Fourth Amendment to allow an officer who lacks reasonable suspicion to delay writing a warning so that he can continue questioning the Defendants and looking for cause to search their car. *See United States v. Sharpe*, 470 U.S. 675, 686 (1985) ("In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly."); *United States v. Simms*, 385 F.3d 1347, 1353 (11th Cir. 2004) ("If a traffic stop is unjustifiably prolonged past the point when a driver's documents should have been returned, it may be found to have ended at the point when the documents should have been returned, and not when they were actually returned.").

Per *Boyce*, *Rodriguez*, and the well-established case law they rely on from the Supreme Court and Eleventh Circuit, an officer *cannot* extend a stop beyond the time reasonably necessary to complete its initial purpose unless the officer has articulable suspicion of other illegal activity. *See Rodriguez*, 135 S. Ct. at 1614-15 ("[A] traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete the mission' of issuing a warning ticket.") (quoting *Caballes*, 543 U.S. at 407). To find otherwise would mean that an officer could stop writing a warning to ask questions, listen to answers, and make phone calls until he has enough justification to search the car – the unreasonable approach that Strom took here. Considering Strom's complete lack of legal authority to continue questioning the Defendants after he completed his check of Shauntane's license, the Court must conclude that Strom's actions were not objectively reasonable and that he was not acting in good faith when he persisted in questioning Trevor about contraband in the car. Moreover, this is

precisely the type of police action that the Fourth Amendment was designed to redress: action that is a violation of the Fourth Amendment, objectively unreasonable under the circumstances, and for which there is no adequate deterrence other than suppression.

> The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure . . . [using] an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?  Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction.  And simple "good faith on the part of the arresting officer is not enough." . . . If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be "secure in their persons, houses, papers, and effects," only in the discretion of the police.

*Terry*, 392 U.S. at 21-22 (citations omitted).

Having objectively assessed the facts known to Strom during the traffic stop, the Court finds that after he completed checking Shauntane's license, Strom's continued extension of the stop to question Trevor was a Fourth Amendment violation, and all evidence discovered as a result of such questioning and the subsequent search of the car and seizure of its contents should be and is suppressed in this case.[23]

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion to Suppress (Doc. 45) is **GRANTED**.

**SO ORDERED**, this __23rd__ day of February, 2018.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**

---

[23] The Court notes that only the issue of suppression is before the Court, and therefore, this Order does not address ownership in or forfeiture of any items seized.